518 So.2d 999 (1988)
Samuel MILES
v.
DOLESE CONCRETE COMPANY.
No. 87 C 1268.
Supreme Court of Louisiana.
January 18, 1988.
*1000 Elven Ponder, Warren Ponder, Ponder & Ponder, Baton Rouge, for applicant.
Gerald Walter, Jr., Schwab & Walter, Baton Rouge, for respondent.
CALOGERO, Justice.
In this workers' compensation case the district court and the Court of Appeal each rejected a claim for additional workers' compensation benefits premised on plaintiff's contention that he suffers from an accident-associated mental disability which was characterized by medical experts as psychogenic pain disorder or chronic pain syndrome.
We granted this writ in what now proves to be an essentially factual case, prompted by a belief that the courts below may have given the claim insufficient consideration because it is based on a mental rather than physical disability, and because of a three to two split and strong dissent in the Court of Appeal, a dissent which referred to expert medical testimony establishing a causal connection between the pain suffered by plaintiff and the work accident Miles v. Dolese Co., 507 So.2d 2 (La.App. 1st Cir.1987) (Shortess and Carter, JJ. dissenting).
Having now reviewed the record we determine that the writ was improvidently granted, and that the judgments below should be affirmed.
The issue presented here is whether the plaintiff has proved by a preponderance of the evidence that the work accident of March 31, 1981, was the cause of his present mental disorder.
The plaintiff was injured on March 3, 1981. The cement truck he was driving for his employer, Dolese Concrete Company, turned over in a single vehicle accident. Plaintiff suffered a blow to the head, two probable rib fractures[1] and a bruised thigh. His employer paid workers' compensation at the rate of $163 per week from the time of the accident until January, 1983a period of nearly two years.
Plaintiff's treating physician, Dr. A.K. McInnis, Jr., saw the plaintiff nine times between the March 3, 1981, accident and June 5, 1981, when he released the plaintiff to resume full work duties.
After his release by Dr. McInnis, plaintiff's attorney referred him to a series of other doctors because of his continued complaints of head and chest pain. The medical reports of each of these seven specialists were introduced into evidence at trial, and will be discussed hereinafter.
Plaintiff was examined by a neurologic surgeon, Dr. K.E. Vogel, on two occasions, September 10, 1981, and March 23, 1982. Results of the neurologic tests were "within normal limits" and Dr. Vogel discharged the plaintiff as "progressing satisfactorily" on March 24, 1982.
Plaintiff saw a Dr. Wilson on July 15, 1982. The record does not disclose Dr. Wilson's specialty. Dr. Wilson's report states that he found normal breath sounds and no rib tenderness. According to the report, Dr. Wilson found that plaintiff's chest appeared normal. The doctor concluded *1001 that plaintiff was a normal 54 year old male with moderate obesity and recommended that plaintiff exercise and lose weight.
Plaintiff was seen by an orthopedic specialist, Dr. Robert D'Ambrosia, Professor of Orthopedics at Louisiana State University Medical Center on two occasions, November 24, 1981, and January 18, 1983. His report states that he did "not find any sign of abnormality" in plaintiff's chest. He recommended that plaintiff see a pulmonary specialist to evaluate his rib pain. Plaintiff related to Dr. D'Ambrosia that his left knee hurt him since the accident but Dr. D'Ambrosia attributed this to his arthritis and stated that he did "not think that the problem in his knee can be directly attributed to the accident."
In January of 1983, plaintiff's workers' compensation benefits were terminated by his employer.
Plaintiff was examined by a pulmonary specialist at Louisiana State University Medical Center on March 14, 1983, on Dr. D'Ambrosia's recommendation. Dr. Russell C. Klein, Professor of Medicine and Acting Chief of the Pulmonary Section, reported that he found no evidence of pulmonary disease and that the chest area appeared normal. He recommended that plaintiff be referred to a pain rehabilitation unit.
Dr. Richard H. Morse, psychiatrist and Director of the Center for Chronic Pain and Disability and Rehabilitation at Mercy Hospital in New Orleans, saw plaintiff on March 31, 1983, over two years after his work accident. He diagnosed plaintiff's condition as "moderate to severe depressive neurosis secondary to pain and disability," while stating he was "somewhat baffled by this patient's history." He recommended that plaintiff be exposed to an entire activity program of Movement, Group, Occupational, Physical and Relaxation Therapies, since part of his rib pain may have actually been a "disuse syndrome" from guarding the painful area. He further recommended that plaintiff be treated at Mercy Hospital's Pain Unit program. His report did not link plaintiff's problems to the work accident of March 3, 1981.
Dr. Morse's deposition was taken on November 17, 1983, and introduced at trial on May 29, 1985. He indicated that he would relate plaintiff's continued head and rib pain to the work accident of March 3, 1981, if plaintiff's head and chest pain arose following the accident and continued since the accident without preceding or intervening injury or disease. Dr. Morse testified that he based his conclusions on a one hour interview with the plaintiff. He stated further in deposition that in his opinion the plaintiff is disabled from driving a truck on a full-time or part-time basis, but that he would not be surprised to find that plaintiff could ride a bicycle for miles as this is often recommended as therapy.[2]
A year later, plaintiff's attorney referred plaintiff to another psychiatrist, Dr. John *1002 W. Bick. In a report dated May 22, 1984, Dr. Bick concluded that plaintiff suffered from a chronic pain syndrome, but made no reference to the work accident as being related to this condition. He recommended treatment at a center for the treatment of chronic pain.
On April 3 and 4, 1985, plaintiff was seen and tested by a clinical psychologist, Dr. Tommy Stigall, Ph.D., on referral by his attorney. Dr. Stigall administered a psychological test, the Minnesota Multi-Phase Personality Inventory (MMPI).[3] Based on results of this test and the patient's history, Dr. Stigall concluded that plaintiff suffered from a psychogenic pain disorder.[4] "Chronic symptoms of tension, anxiety and depressed mood are likely to be misinterpreted by the patient as physical pain or disability." His report did not link plaintiff's pain syndrome to the 1981 work accident.
Dr. Stigall's deposition was taken on May 19, 1985, and introduced at trial. He stated that plaintiff suffers from a psychogenic pain disorder growing out of an unsatisfactory adjustment to circumstances and that he would relate the pain disorder to the work accident in particular, because of the temporal relationship between the accident and the onset of the pain. He admitted that not having seen the plaintiff until four years after the accident made it "very difficult to pinpoint any one specific cause" of the pain disorder, but stated that the accident seemed a reasonable explanation. He went on to explain that psychogenic pain disorder often involves selection of an event, such as the accident here, as the cause of problems. Symptoms are maintained by a person suffering from psychogenic pain disorder in order to avoid something noxioussuch as having to go to workor to gain some advantage from the environment. He felt that the results of the MMPI showed that the plaintiff is *1003 the kind of person who exhibits a "chronically hostile-dependent relationship with authority figures" including employers and that he would experience stress in a work situation where others make demands on him.[5]
In addition to the doctors to whom plaintiff was referred by his attorney, plaintiff was seen on numerous occasions at the Veterans Administration Hospital. He was treated for degenerative arthritis and hypertension. He was hospitalized in August of 1982 for hernia surgery. Outpatient records show that plaintiff made numerous complaints to the hospital staff of medical problems unrelated to the work accident.[6] *1004 There are no reports in the V.A. Hospital records of head pain and there are only two occasions when he complained of rib pain. On March 5, 1981, two days after the accident, plaintiff reported to the V.A. staff that he was involved in the work accident. On April 8, 1981, about one month after the accident, plaintiff was treated for complaints of pain in the right rib cage area caused by what he reported as a fall while painting about a month earlier. On this occasion, he also stated that "he was in an accident [apparently this work accident] but that he had been released to return to work." An x-ray taken on this date revealed no sign of a recent rib fracture.
The only other report of rib pain shown in the V.A. Hospital records is on March 15, 1984three years after the accident. The hospital's treating physician's entry shows that he attributed this pain to a "manifestation of extensive joint problems of knees, ankles, elbows, shoulders, [arthritis] etc." X-rays taken showed no abnormalities in the chest.
All parties agree and the medical evidence confirms that a short time after the accident plaintiff recovered from the physical injuries sustained in the accident.
Furthermore, there is no question but that the district court and the Court of Appeal respected the right of the plaintiff to establish a claim for workers' compensation based on a mental disorder arising out of a work-related accident. The courts were fully aware of, and the cases support the legal principle that disabling mental conditions causally related to an employment accident are compensable under the workers' compensation scheme. Droddy v. Cliff's Drilling, Inc., 471 So.2d 223 (La. 1985); Jordan v. Southern Natural Gas Co., 455 So.2d 1217 (La.App. 2d Cir.1984). See also, D. Juge and D. Shraberg, Marking Out Boundaries: The Relationship Between Work and Psychological Disorders, A Legal and Medical Analysis, 30 Loy.L. Rev. 249 (1984).
Review of the evidence and testimony presented at trial does not support a finding that it is more likely than not that the plaintiff's current mental disorder was caused by the 1981 work accident.[7] If indeed the plaintiff has psychogenic pain, it is at least equally likely based on the evidence presented that this pain has been precipitated by stress and anxiety associated with events in his life other than the work accident.[8]
Both Dr. Stigall and Dr. Morse based their opinions that plaintiff's pain was related to the work accident on very brief visits with the plaintiff several years after the accident. Both were of the opinion that the plaintiff's continued rib and head pain was related to his work accident, but those opinions were qualified as to causation. They both based their opinions on the assumption that the plaintiff had no comparable head and chest pain, nor other serious problems either physical or mental, prior to the accident and that since the accident plaintiff has suffered constant and severe head and rib pain. The V.A. Hospital records, in particular, refute this assumption. The records reveal several longstanding medical problems prior to the accident *1005 and a myriad of unrelated medical problems after the accident. They also demonstrate an absence of complaints to support plaintiff's claim of continuous head and chest pain. The other medical evidence presented does not point to a causal link between the pain plaintiff now suffers and the work accident of March, 1981. The Veterans Administration Hospital records fail to support plaintiff's contention that he has suffered rib and head pain continously since the accident. These records do show that plaintiff has suffered pain from a degenerative arthritic condition as well as other unrelated ailments. Dr. Bick's psychiatric evaluation establishes that plaintiff does indeed suffer from a chronic pain syndrome, but it does not link this syndrome to the work accident.
Herein lies the shortfall in plaintiff's case. The determination as to whether or not plaintiff's pain was continuous and as to whether or not plaintiff continually correlated his pain to the work accident was one appropriate for the trial judge. When the trial judge found, and properly so, that the record did not support the fundamental assumption on which these two doctors' opinions were premised, he was at liberty to discount those opinions in reaching the conclusion that no additional workers' compensation benefits were due this plaintiff.
It was the trial court's task to weigh all the evidence presented and determine the credibility of the witnesses in order to decide if the work accident was the cause of plaintiff's present medical problems. This it has done correctly. As this Court has stated previously, "[c]ausation is not necessarily and exclusively a medical conclusion. It is usually the ultimate fact to be found by the trial court, based on all the credible evidence." Haughton v. Fireman's Fund Am. Ins. Cos., 355 So.2d 927, 928 (La.1978).
The Court of Appeal concluded that the trial judge was not manifestly erroneous or clearly wrong in dismissing plaintiff's suit. Based on our independent review of the record we agree. When the opinions of Dr. Stigall and Dr. Morse, qualified as they are, are weighed alongside of the other medical evidence, it becomes apparent that the courts below were correct in concluding that plaintiff did not prove by a preponderance of the evidence that he suffers from a mental (or physical) disability associated with or arising out of the work accident and that he has been paid the full workers' compensation benefits to which he is entitled.

Decree
For the foregoing reasons, the judgment of the Court of Appeal is affirmed.
AFFIRMED.
NOTES
[1] On the day of the accident, plaintiff was treated at Our Lady of the Lake Hospital in Baton Rouge. Results of X-rays taken on that date were negative. Plaintiff returned on March 17, 1981, for additional X-rays. The report of that date states that the X-ray showed "suggestive irregularities at the costochondral junctions of the ninth and tenth ribs", as well as degenerative spurring on the right side of the spine in the mid thoracic area. On May 5, 1981, plaintiff again returned to Our Lady of the Lake Hospital for more chest X-rays. The report of that date states, "There are no findings on today's examination compatible with rib fractures. No healing rib fractures are demonstrated."
[2] Dr. Morse, in his deposition, testified as follows:

Q. Doctor, given the history that Mr. Miles gave you, that he was in a truck automobile accident on March 3, 1981, assuming that Mr. Miles has been truthful and he has had constant pain since that time, would you relate the pain he is having now to the trauma episode, or would you relate it to some other causation?
A. Well, you're asking me as a witness to form an inference?
Q. Fine.
A. Just purely on medical grounds?
Q. Right.
A. Since he struck his head and rib cage in an accident, and the history is of a significant blow, and I am to accept the history as being accurate, I would connect it to the subsequent head and rib cage pain with the following qualifications. I do not have any information that he had a similar or proceeding (sic) problem or that there was any other intervening injury or disease.
Q. Assuming for the moment that he had no preceding problems up until March 3rd, 1981, and assuming that the evidence will show that he had no subsequent trauma?
A. [If] There is sufficient continuity in time and there is sufficient connection of the pain with the trauma, then I would draw the conclusion that one would cause the other.
Q. What you are saying, Doctor, is that medically more probable than not if the history is correct that he did not have this problem prior to March 3, 1981, and he had no subsequent injury or trauma episode, that the pain he is experiencing now would be related to the automobile truck collision?
A. Yes.
[3] The MMPI is a test designed to measure the behavior or "personality" of the individual to determine psychological functioning. The purpose of administering the test is to establish the test-taker's personality profile and evaluate personality or character traits. It is the most widely used of the personality inventories, self-reporting devices in which the test-taker answers specific questions about his feelings. 3A C. Frankel (ed.). Lawyer's Medical Cyclopedia of Personal Injuries and Allied Specialties §§ 21.15,.16 (1983); 3B R. Gray and L. Gordy, Attorneys Textbook of Medicine § 101.33(4) (1987). "The MMPI is an objective psychometric test consisting of 566 written statements which the person being tested assesses as true as applied to him or as false as applied to him. Scoring of the test yields scores for four validity scales and ten basic clinical or personality scales." C. Cohen, H. Foster, E. Peck, III, MMPI Evaluation of Patients with Chronic Pain, 76 Southern Medical Journal 316, 316-18 (1983). The validity scales include a measure to detect lying or malingering. "The ten clinical scales provide reliable differences among scores from the different clinical response groups." Id. The clinical scales test the individual's range of feelings dealing with such areas as body symptomatology, interpersonal relations, feelings of depression, social withdrawal, aggressive feelings and interests. C. Frankel, at §§ 21.15, .16. Results of the test are used in formulating individual treatment programs, assessing the existence and extent of mental disorders, developing psychopathological diagnoses and designing programs of therapy. The test "provides interexaminer consistency and may also be used to show psychologic changes over time." C. Cohen at 318.

By comparing an individual's score on the MMPI with those of a clinical test group, the examiner may, for example, establish that the individual's personality traits fit the clinical picture of those persons who suffer from psychogenic pain disorder, as was done here.
[4] Psychogenic pain is a term applied to pain for which no organic cause can be found. It is evidenced by discomfort experienced in an organ or region of the body which is functioning normally. 4 R. Gray & L. Gordy, Attorney's Textbook of Medicine § 178 (1987).

Psychogenic pain disorder is a modern term for a neurotic condition which arises out of an individual's attempt to alleviate anxiety with symptoms of pain and is due to the individual's unconscious emotional and mental factors and not to organic causes. Anxiety is converted into bodily symptoms. There are physical problems in the absence of demonstrable organic findings to explain the physical symptoms. People with the condition use their bodies to express anxiety. Psychogenic pain disorder is characterized by severe and prolonged pain inconsistent with organic findings. There is generally a temporal relationship between an environmental stimulus that is related to a psychological conflict or need and the initiation or exacerbation of pain or by pain that enables the person to avoid some activity that is noxious to the individual or enables the individual to get support from the environment that might not otherwise be forthcoming. Id., Vol. 3B at §§ 101.42, 101.53(2), 101.53(3c).
[5] In his deposition given in connection with trial of this matter, Dr. Tommy Stigall testified:

Q. The problems that were encountered by Mr. Miles in the last few years, that is, the various problems, the surgery episodes, hernia problems, high blood pressure problems, arthritic problems, are problems which can give rise to some psychogenic pain syndrome, can they not?
A. Yes, sir....
Dr. Stigall was later asked:
Q. I think it is fair to say that in 1985 without having had the benefit of seeing Mr. Miles back in 1981 and since then, it is very difficult to pinpoint any one specific cause, if, in fact, there is any one specific cause of his psychogenic pain disorder that you see today, is that a fair statement?
A. It certainly would be difficult. I think that with psychogenic pain disorder there usually is foundand the diagnosis really implies a temporal relationship between some life stress or life circumstance and the onset of the symptoms. So with that understanding of what the diagnosis implies, I think that theand the patient's description of the onset of the symptoms and his history, the accident seems a reasonable, plausible event which is related to the symptomsthe pain syndrome.
Q. But in layman's terms as related to you by the patient he focuses on the accident and he points the accident out as the problem the event that caused his problems, is that a fair statement of what you are saying?
A. Yes, sir, that certainly is correct.
Q. Doctor, in these cases, is there ever any monetary gain involved on the part of people who have been involved in an incident and have other problems, health problems that arise when one is compensable perhaps and the other isn't, is that a factor that must be evaluated?
A. Yes, sir. I think that very often, and it is pretty well understood, again, that one of the features of a psychogenic pain disorder in addition to this temporal relationship between some event and the onset of the symptoms that has apparently some psychological significance to the individual is very often the likelihood that there is some, what might be called secondary gain for the individual, some advantage to not being able to function or perform one's normal duties either by avoiding something that was previously present that was noxious to the personnot having to go to work, for example, under circumstances that one doesn't like or by some anticipation of some advantage, reinforcement, support from the environment, some special consideration from others who might be solicitous of this person's condition based on physical symptoms. (Emphasis added).
[6] Plaintiff was seen on numerous occasions, both before and after the work accident, at the Veterans Administration Hospital. He was diagnosed as early as 1980 as having degenerative arthritis. In February of 1981, shortly before the work accident, plaintiff was referred for a hypertension workup, was placed on a low salt diet, and was instructed to discontinue smoking. Also that month, plaintiff reported that he was not sleeping well, was having "job problems" and was worrying. On March 5, 1981, he reported to the V.A. staff that he was involved in the accident and complained of a lump on the right side of his head and a painful left forearm. On April 8, 1981, shortly after the accident, plaintiff was seen as a walk-in patient at the V.A. Hospital for complaints of pain in the right rib area caused by a fall while painting which he reported had occurred a month earlier. The report notes that he "[a]lso states he was in an accident but that he had been released to return to work." An X-ray taken on this date revealed no sign of a recent rib fracture. On July 6, 1981, plaintiff reported that he was feeling okay.

Between the time of the accident and the time of this trial plaintiff has been seen at the V.A. Hospital on numerous other occasions for routine blood pressure checks to control his hypertension. He was also treated as an outpatient at the V.A. with complaints of rectal pain (10/81), fungal infection of the right foot and water blisters on the right foot (5/82), a slice of metal in the left middle finger (5/82), pain in the genital area (6/82), discomfort in the groin region, but reported feeling pretty good (11/82), came in for blood pressure check and reported feeling well (12/82), low backache (1/83), pain in the left leg and foot due to arthritis (5/83) (about one month after his visit to Dr. Morse), low back pain (8/83), stomach pain (1/84), arthritis (1/84), swollen knees and pain in the wrist (3/84), swelling in both knees, both ankles and the left elbow (5/84), swelling of ankles and wrists and pain in the knees and wrists (7/84), nausea because of medication change (9/84), pain in both wrists, ankles and the left elbow (10/84), pain in the ankles, the left knee but no backache (12/84), a sore right foot (1/85), and a rash on the foot (1/85). In not one of these visits did the records indicate that plaintiff complained of, or was treated for, rib and/or head pain.
In addition to these numerous visits he was hospitalized at the V.A. Hospital and had bilateral inguinal hernia repair surgery in August, 1982. There is no record of complaints of head pain in the V.A. Hospital records. The only complaint to the V.A. staff of pain in the rib area from this plaintiff is recorded in the V.A. reports of March 15, 1984. That entry indicated that the treating physician attributed this pain to "a manifestation of extensive joint problems of knees, ankles, elbows, shoulders, etc." X-rays taken showed no abnormalities in the chest.
[7] The evidence consisted of plaintiff's testimony, the deposition of Dr. Richard H. Morse, the deposition of Dr. Tommy Stigall, the medical records of the eight physicians who examined the plaintiff since the work accident, the medical records of the Veterans Administration Hospital, the lay testimony of the husbands of plaintiff's niece and first cousin, and the stipulated testimony of other lay witnesses.
[8] In describing his pain to Dr. Stigall in 1985, plaintiff reported that he has continuous chest pain, "intermittent discomfort in the area where he was struck on the head at the time of the accident, and most especially, joint pain which he attributes to his arthritic condition." (Emphasis added.)