FOGG, Judge.
In this appeal from a judgment for the defendant in a wrongful death action, the plaintiffs, the decedent’s wife and children, contend that the jury erred in finding that, although the defendant nursing home was negligent, this negligence did not deprive the nursing home resident of a chance of survival. We affirm.
On February 28, 1987, Salvador Drago[1] died at the age of 57 while a resident at The Retirement Center. Mr. Drago’s wife, Tena, and his four children, Debora Ann Drago Harper, Daryl Peter Drago, Donna Kay Teekel, and Danette Lynn Drago, filed a wrongful death action against BGK Management, Inc., a Louisiana corporation owning and operating The Retirement Center.[2]
Following a trial, the jury answered special interrogatories finding that The Retirement Center was negligent in the care of Mr. Drago, but that the negligence of The Retirement Center did not deprive him of a chance of survival. The judge rendered judgment in conformity with the jury verdict, dismissing the suit. The plaintiffs filed a motion for judgment notwithstanding the verdict, and, in the alternative, a new trial, which the trial judge denied. The plaintiffs appeal, contending that the jury erred in failing to find that the negligence of the retirement center deprived Mr. Drago of a chance of survival and in failing to award damages.
When reviewing factual findings on appeal, a court of appeal may not set aside a jury’s finding of fact in the absence of manifest error, or unless it is clearly wrong. Under a two-part test for the reversal of a jury’s determinations, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and the appellate court must further determine that the record establishes that the finding is clearly wrong. The reviewing court must always keep in mind that if the jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where two permissible views of *783 the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La.1993).
For the plaintiffs to prevail in this action, it was not necessary to prove that the patient would have survived if proper treatment had been given, but only that there would have been a chance of survival; it is only necessary to show a reasonable probability that the proper treatment would have been life saving in these circumstances. The plaintiff must prove by a preponderance of the evidence that a chance of survival existed and that it was lost as a result of the defendant’s negligence. Smith v. State of Louisiana through the Department of Health and Hitman Resources Administration, 523 So.2d 815 (La.1988); Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986).
On October 31, 1986, in a hospital, Mr. Drago suffered a brain hemorrhage following treatment with Streptokinase, a clot-busting drug administered to treat a heart attack. He was rendered semicomatose and remained in the hospital; on February 27, 1987, he was discharged to The Retirement Center.
On admission to The Retirement Center, Mr. Drago was still semi-comatose and quadriplegic. He had a permanent tracheosto-my tube and could not speak. He ate through a tube because he could not swallow and wore a fecal bag as he had no bowel or bladder control; he was breathing on his own. According to the discharge summary of his treating physician, Dr. Edmond Vinci, a physician practicing internal medicine, Mr. Drago could open his eyes and appeared to be aware of certain things around him, but he was unable to move or respond. Although Dr. Vinci considered Mr. Drago’s survival and progress remarkable, he still described his prognosis as poor. Dr. Vinci testified that Mr. Drago’s prognosis was poor, not simply neurologically, but also because in his state several complications could arise.
Additionally, prior to 1987, Mr. Drago had various medical problems. He had suffered a stroke in 1981, but had recovered to the point where he only occasionally used a walking cane. He also had a history of high blood pressure, diverticulosis, hiatal hernia, obesity, diabetes, and cancer of the colon. While in the hospital, he had pneumonia once, several episodes of sepsis, and stomach ulcers. On admission to The Retirement Center, Mr. Drago had arteriosclerotic heart disease as well as an infection around his tracheostomy tube, an ear infection, a mouth ulcer, a bed sore, and colitis.
From the time Mr. Drago was admitted to The Retirement Center until his death about thirty-six hours later, The Retirement Center failed to administer the quality of care a patient such as Mr. Drago required. Prior to selecting The Retirement Center for Mr. Drago, his family had thoroughly looked into skilled nursing care facilities and chose The Retirement Center because its administrator assured them that Mr. Drago’s needs would be met. Yet The Retirement Center failed to have special foods, medications, a feeding pump, and mattress immediately available as promised. When the medications finally arrived for Mr. Drago, they were in the wrong form. Additionally, the family experienced much trouble in obtaining assistance from the nurses and staff. Carl Harper, Mr. Dra-go’s son-in-law and Debora Drago Harper’s husband, had to once suction Mr. Drago’s tracheostomy tube by himself, since he could not obtain the services of a nurse to do it. The suctioning which was performed by the nurses was not in a sterile form.
While asserting that The Retirement Center was negligent in these ways, the plaintiffs contend that The Retirement Center’s failure to properly monitor Mr. Drago’s vital signs and report them to his physician caused him to lose his chance of survival. Due to the brain hemorrhage, Mr. Drago had no central temperature control; while in the hospital, he often experienced temperatures ranging from 101° to 103° in the absence of any documented infection. Consequently, Dr. Vinci had standing orders that he was not to be called by The Retirement Center unless Mr. Drago’s temperature was 104° or greater.
*784 Mr. Drago’s temperature did not reach 104° on the day he was admitted to The Retirement Center, but on the following day at 8:35 a.m., the nurses’ notes show that his temperature was 104.4° and his blood pressure was 110/80. The nursing chart shows that Nurse Angela Jenkins called Dr. Frank Alvarez, Dr. Vinci’s partner who was on call, who ordered Tylenol to be given for the temperature and that he be notified if the temperature is “not down.” Additionally, the nursing home’s policy requires that vital signs be taken at least every four hours when a patient is sick.
Mrs. Debora Drago Harper testified that the temperature taken by family members at 10:21 a.m. was 105.8°. At 11:30 a.m., the family again took the temperature and blood pressure, which were 106.1° and 88/60.
The nurses’ notes do not show that Mr. Drago’s temperature was taken again until 3:30 p.m., when it was taken at the family’s request[3]; Mr. Drago’s temperature was 105.8° and his blood pressure was 80/56. According to the notes, Nurse Louise Vaughn called Dr. Alvarez, who ordered that Tylenol and increased fluids were to be given, and that he was to be called if the temperature was not down in two hours. Nurse Vaughn testified that she could not recall whether Dr. Alvarez said to call if the temperature was still lower but above 104°; she testified that she would have called if it remained above 104°. Nurse Margie Brass, the nurse caring for Mr. Drago after 3:30 p.m., testified that she understood the order to be that she should check the temperature in two hours and call if it was not below 104°. Nurse Brass testified that she did check the temperature and that it was below 104°, although this is not in the nurses’ notes.
At 6:06 p.m., family members took Mr. Drago’s temperature, which was 104.9°. According to Mrs. Harper, the family was told by the nurse caring for Mr. Drago at that time, whom they knew only as “Teena,” that she called Dr. Alvarez and that Dr. Alvarez told her to call back if the temperature rose. Mr. William Kimbro, the owner and administrator of The Retirement Center, testified that there were no records of a “Teena,” nor could he find her.
The nurses’ notes do not show that the temperature was taken again until 9:00 p.m., when an entry in the chart by Nurse Brass shows the temperature as 103.2° and the blood pressure as 96/60; at 9:15 p.m., the blood pressure dropped to 84/56 and Mr. Drago’s respiration became labored, sputum began draining from his mouth, and his fingers, toes and feet became cyanotic. Dr. Alvarez was called, and at 10:00 p.m. he ordered Mr. Drago to be transferred to the hospital immediately. When the ambulance arrived, Mr. Drago had no vital signs. The death certificate signed by Dr. Alvarez states sepsis as the cause of death. No autopsy was performed.
Dr. Vinci testified that it appeared that Mr. Drago had sepsis, which he described as an infection where the bacteria get in the blood stream. He stated that Mr. Drago’s fever, which was much higher than he normally had, and his drop in blood pressure, were the two main indicators of sepsis. Dr. Vinci testified that once a patient has “full blown” sepsis the chance of survival is 20 percent and once a patient with sepsis suffers a cardiovascular collapse his chance of survival is nil. According to Dr. Vinci, there is a six to eight hour window for treating sepsis from the time that the bacteria gets in the bloodstream for a better chance of survival, and the drop in blood pressure can indicate where the window begins. Dr. Vinci explained that the earlier sepsis is suspected and the earlier it is treated, the greater the chance of survival. Treatment for sepsis is antibiotics. Dr. Vinci testified that when Mr. Drago had septic infections in the hospital, those infections were always treated with antibiotics, and Mr. Drago always responded.
Dr. Alvarez testified that while he had no recollection of the specifics of his orders given on February 28th, his order given at 3:40 p.m. that the nurses should call if Mr. Dra-go’s temperature was not down in two hours meant that the temperature would have to be down at least one degree, showing a down *785 ward trend. He testified that if the temperature had not gone down or if the blood pressure was still low, he might have asked questions or he might have had Mr. Drago sent to the hospital. The questions would have been about respiratory rates, change in appearance, and the presence of any vomiting, diarrhea, or difficulty breathing. Dr. Alvarez stated that Mr. Drago’s respirations and pulse at 3:30 p.m. and 9:00 p.m. were the same and also that he would be concerned if the temperature remained at 104° for too many hours. Dr. Alvarez told the Drago family that The Retirement Center had not called back within the two hours, so he was unaware Mr. Drago was so seriously ill. According to Dr. Alvarez, if Mr. Drago had been hospitalized, he would have obtained blood cultures, urine cultures, and started an IV. He also might have administered antibiotics and/or oxygen, depending on Mr. Dra-go’s temperature and other laboratory data. When Dr. Alvarez was asked if Mr. Drago could have survived if The Retirement Center had notified him of Mr. Drago’s condition by 5:40 p.m., he replied that there was always a chance.
Dr. Steven Zuckerman, a neurologist, who saw Mr. Drago while he was hospitalized, testified that the usual course for patients with brain damage as severe as Mr. Drago’s is that they are prone to getting clots in their legs which would go to their lungs or getting pneumonia or infections. Dr. Zuckerman testified that with Mr. Drago’s type of brain injury, to expect any further recovery was unrealistic. Dr. Zuckerman disagreed with Dr. Vinci’s opinion that Mr. Drago was aware of what was going on around him.
Dr. Barbara Wade, a physician specializing in the treatment of infectious diseases, treated Mr. Drago while he was in the hospital. Before determining through extensive tests that Mr. Drago’s fevers were due to loss of central temperature controls, she was consulted to determine whether his fever was due to infection. Dr. Wade explained that Mr. Drago was at risk for infection and at increased risk for a pulmonary embolism and pneumonia. Dr. Wade testified that nothing in the nursing home records indicated to her a cause of death for Mr. Drago and that she saw no evidence which would support the diagnosis of sepsis. She testified that Mr. Drago could have died from a repeat heart attack, pulmonary embolism, pneumonia, repeat stroke, or toxic megacolon, and that she could not rule out any of those based on the symptoms he had. Although Dr. Wade did state that a spike in temperature, a drop in blood pressure, and cyanosis were compatible with sepsis, she added that without a blood culture, it was not possible to diagnose Mr. Drago with sepsis as a cause of death. Dr. Wade testified that Mr. Drago “was in the end stages of life, and ... neurologically, there ... didn’t seem to be any recovery at all. And the typical sequence of events from that point is death.”
When asked about Mr. Drago’s prognosis for surviving sepsis, Dr. Wade testified that she could not specify his prognosis and that due to his medical problems and prolonged hospitalization, he would have a worse prognosis than someone young and healthy; she also added that the prognosis for survival depended on the organism causing the infection. Dr. Wade explained that the treatment for sepsis is removing the primary area of infection and treatment with antibiotics.
To support their contention that the jury was required to accept sepsis as the cause of Mr. Drago’s death, the plaintiffs cite La.R.S. 40:42, which states in pertinent part, “Except for delayed or altered certificates, every original certificate on file in the vital records registry is prima facie evidence of the facts therein stated.” While the jury may have found that the plaintiffs established that sepsis caused Mr. Drago’s death with the death certificate, the jury could also have reasonably found that the defendant rebutted this with the testimony of Dr. Wade. Additionally, both Drs. Vinci and Alvarez testified that Mr. Drago was at risk for a pulmonary embolism, stroke, heart attack, kidney failure, or a toxic colon in addition to infections, although they did state that high fever did not signify an embolism, stroke, or heart attack, and that a toxic colon did not occur suddenly. Thus, the jury could have reasonably found that Mr. Drago did not die from sepsis, in which case, The Retirement Center’s negligence in failing to monitor Mr. *786 Drago’s vital signs would not have reduced his chance of survival from an episode of sepsis.
In light of the evidence presented, the jury could also have found that Mr. Drago did die from sepsis, but that he had no chance of survival due to his condition; the jury could have inferred that the 20 percent chance of survival cited by Dr. Vinci applied to healthier patients. Thus, the jury could have inferred that even if the nursing home personnel had called Dr. Alvarez around 5:40 p.m. to report Mr. Drago’s vital signs, any treatment at that point would have been ineffectual. The jury could also have reasoned that because Mr. Drago’s temperature was lower at that time, Dr. Alvarez would not have changed his treatment of Mr. Drago.
Causation is a question of fact. Smith v. State through Department of Health and Human Resources Administration, 523 So.2d 815 (La.1988). Thus, while the negligence of The Retirement Center in its treatment of Mr. Drago was intolerable, a reasonable factual basis exists for the jury’s finding that this negligence did not deprive Mr. Drago of a chance of survival. Therefore, we cannot say that the jury was clearly wrong and the plaintiffs’ contention that the jury erred in finding that The Retirement Center’s negligence did not deprive Mr. Dra-go of a chance of survival has no merit.
For these reasons, the judgment of the trial court is affirmed, and the plaintiffs are to pay the cost of appeal.
AFFIRMED.
SHORTESS, J., dissents with reasons.

. We note that Mr. Drago’s first name is spelled "Salvatore” in the pleadings filed by the plaintiffs, but is always spelled "Salvador” in all documents; therefore, we will use the latter spelling.

. The plaintiffs amended their petition to change the names "Tina” to "Tena” and "Deborah Ann Drago” to "Debora Ann Drago Harper.”

. The temperature had to be taken by Ms. Vaughn because the nurse on duty, Ms. Brass, refused to take it, even when requested to do so by the family.