590 So.2d 619 (1991)
Preston Joseph SUIRE, Clayton Jude Suire, Rachel Suire LaSalle, Ranger Insurance Company, and Heritage Manor Nursing Home, Plaintiffs-Appellants,
v.
LAKE CHARLES MEMORIAL HOSPITAL and Dr. William F. Foster, Defendants-Appellees.
No. 90-268.
Court of Appeal of Louisiana, Third Circuit.
November 13, 1991.
*620 Darrell Hartman, Michael L. Schilling, Jr., Abbeville, for plaintiffs-appellants.
Pugh & Boudreaux, Donlon Pugh, Lafayette, for defendant-appellee, Lake Charles Mem. Hosp.
Raggio, Cappel, Chozen & Berniard, Richard Cappel, Lake Charles, for defendant-appellee Dr. William F. Foster.
Before DOMENGEAUX, C.J., and STOKER and YELVERTON, JJ.
DOMENGEAUX, Chief Judge.
The survivors of Laura Suire filed this medical malpractice suit against Dr. William Foster and Lake Charles Memorial Hospital. Plaintiffs are Laura Suire's husband, Preston Joseph Suire, and their two major children, Clayton Jude Suire and Rachel Suire LaSalle. Also named as plaintiffs are Heritage Manor Nursing Home and Ranger Insurance Company who paid worker's compensation death benefits on behalf of Laura Suire. After a bench trial, judgment was rendered in favor of defendants and plaintiffs appeal, raising a variety of legal and factual issues.
On April 10, 1983, Laura Suire was admitted to Lake Charles Memorial Hospital for a lumbar laminectomy, which procedure was recommended to alleviate problems resulting from a work related injury sustained in 1981. The surgical procedure was performed by Dr. Foster, a neurosurgeon, on April 11 and was uneventful and without complication. In the early morning hours of April 13, Laura Suire died from a fulminating, or overwhelming, postoperative infection. It was later determined that the infectious organism which caused her death was streptococcus pyogenes, a gram positive organism, as distinguished from a gram negative organism. Although this strep. organism is a common cause of sore throats, it is very rarely a cause of postoperative infections. In fact, only two cases of a postlaminectomy streptococcus pyogenes infection have ever been reported, and only 2-4% of all wound infections are caused by this organism.
Plaintiffs filed this malpractice suit alleging negligent postoperative care on the part of Dr. Foster and negligent nursing care on the part of the hospital. All parties stipulated at the close of the evidence that the cause or source of the infection was not at issue and the infection itself was unpreventable. Rather, plaintiffs contend Dr. Foster and/or Dr. Michael Rotenberg, who was called in by Dr. Foster as a consulting internist, failed to timely diagnose and treat the infection, and the nursing staff failed to follow orders concerning notification of Dr. Foster and administration of a certain drug.
We will address first the legal issues raised by the plaintiffs in this appeal. Plaintiffs contend Dr. Foster must be held vicariously liable for any negligence on the part of Dr. Rotenberg. The trial judge relied on Royer v. St. Paul Fire and Marine Insurance Co., 502 So.2d 232 (La.App. 3d Cir.1987), writ denied, 503 So.2d 496 (La.1987), and held that the medically accepted and appropriate procedure of calling in a specialist for a consultation does not subject the treating physician to vicarious liability for the negligence of the consulting specialist. This ruling was correct. There is no evidence of an agency, employment, or master-servant relationship between Drs. Foster and Rotenberg; they practiced different types of medicine, neurosurgery and internal medicine, and were completely independent of each other. Dr. Foster requested the consultation both because he was occupied with another patient and because he wanted the special skills of an internist. These facts do not give rise to vicarious liability on the part of Dr. Foster.
*621 Plaintiffs next contend the trial court erred in treating Dr. Foster as a specialist in the field of neurosurgery, in accordance with La.R.S. 9:2794. There is no question that Dr. Foster is a neurosurgeon, practices neurosurgery, and should be held to the standards and the degree of care ordinarily practiced by other neurosurgeons. What we can discern from plaintiffs' brief, however, is that they are actually complaining of the trial court's hesitancy to accept the expert opinion of Dr. Burt Meyers, an infectious disease specialist, concerning the standard of care applicable to Dr. Foster, a neurosurgeon. The trial judge ultimately ruled that because Dr. Meyers' opinion did not alter the outcome of the case, the question of the admissibility of that opinion need not be answered.
Plaintiffs argue the trial judge should have fully considered Dr. Meyers' opinion because any physician, regardless of his specialty, should be able to treat a wound infection; therefore Dr. Meyers properly rendered his expert opinion on the treatment of wound infections. This argument misses the point. The trial judge was not concerned with Dr. Foster's ability to treat a wound infection, but rather Dr. Meyers' expert capabilities as an infectious disease specialist to treat a wound infection. In this particular treatment of an extremely rare infection, the trial judge suggested, Dr. Meyers would be held to a higher standard of care than Dr. Foster and perhaps cannot testify as to what the appropriate lower standard of care may be. By way of analogy, we suggest that while many types of physicians (pediatricians, general practitioners, family practitioners, internists) may be able to diagnose and treat a high risk pregnancy, an obstetrician, who specializes in the diagnosis and treatment of pregnancy, may be held to a higher standard of care than other physicians. In any event, Dr. Meyers' opinion was admitted but was given little weight by the trial judge. We find no error in this determination.
Plaintiffs next assign as error the trial court's acceptance as expert witnesses certain persons who were also testifying as fact witnesses. Not only did plaintiffs fail to name these witnesses for purposes of this appeal, but they also failed to make such an objection at trial pertaining to any witnesses. Therefore, we cannot consider this issue.
As their final legal issue, plaintiffs contend the trial court erred in allowing into evidence statistical data published in 1984, the year after Laura Suire's death. The data indicated that Tobramycin, a drug prescribed by Dr. Rotenberg, is effective against streptococcus pyogenes 51% of the time. We do not believe the data was introduced to prove Dr. Rotenberg's knowledge of the effectiveness of Tobramycin against Mrs. Suire's infection; after all, Dr. Rotenberg did not even know what type of organism he was dealing with until three days after her death. Rather, the evidence was offered merely to show that Tobramycin is effective against a variety of infections and was a valid choice of antibiotic. The publication date of this data is irrelevant and the trial court did not err in allowing its introduction.
The remaining arguments presented by plaintiffs pertain to factual findings and credibility determinations made by the trial court. Our review of the record reveals no manifest error committed by the trial court.
Concerning the negligence of the Lake Charles Memorial Hospital nursing staff, plaintiffs contend the nurses administering to Mrs. Suire did not follow Dr. Foster's postsurgery standing orders. Dr. Foster's standing orders required the nursing staff to notify him of certain changes in a patient's condition. The hospital records support the factual determination that Dr. Foster was notified through his nurse, Fran Avery, when Mrs. Suire's temperature rose to 102° or above, when she became unusually restless, and when she complained of nausea, pain, or the inability to urinate. The record also supports the conclusion that the practice of contacting a physician through his nurse (as in this case), office, or answering service is a common and acceptable means of getting a message to a treating physician.
*622 Plaintiffs also suggest the floor nurse was negligent in waiting one hour and forty minutes before contacting Dr. Foster when Mrs. Suire's temperature rose to 101 at 4:00 p.m. on April 12. At this time, her surgical dressing showed slight drainage. Dr. Gerald Litel, Dr. Foster's expert neurosurgeon, testified that the change in Mrs. Suire's condition as described in the 4:00 p.m. nurse's note did not indicate "clear and undeniable evidence of an infection." In fact, the testimony of Dr. Charles Sanders, Dr. Foster's expert infectious disease specialist, as well as the testimony of Drs. Foster, Litel, and Meyers, indicates that Mrs. Suire's symptoms of pain, fever, restlessness, and slight drainage from the incision are common complaints following back surgery. Neither Dr. Sanders nor Dr. Litel believed the hospital nursing staff failed to comply with the acceptable standards of care. By 5:20, Mrs. Suire's symptoms became more severe, she was put into arm restraints, and the floor nurse thought "something wasn't quite right with the patient." At this point, the floor nurse, experienced in the care of postoperative patients, became concerned, and called Dr. Foster. We do not believe the floor nurse was negligent in waiting until 5:40 to contact Dr. Foster, through Fran Avery, to advise him of these developments.
Also concerning the alleged negligence of the hospital, plaintiffs contend the ICU nurse administering to Mrs. Suire failed to give the drug Mandol ordered by Dr. Rotenberg at 2:00 a.m. on April 13. Dr. Rotenberg was consulted at approximately 8:00 p.m. on April 12 and transferred Mrs. Suire to ICU immediately. The hospital chart reflects the doctor's order of Mandol, but no where is the administration of Mandol recorded other than in Dr. Rotenberg's progress note which simply states the patient "has received Mandol." The ICU nurse's notes appear to contain recordation of all other drugs administered. Both Dr. Rotenberg and the ICU nurse, however, testified unequivocally that Mandol was given. They explained that the hectic atmosphere and emergency nature of Mrs. Suire's condition probably resulted in the absence of some chart entries. The trial judge accepted this testimony and we find no error in this credibility determination. Accordingly, we affirm the trial court's judgment in favor of the hospital.
We turn now to the alleged negligence of Dr. Foster. The primary allegation of malpractice on the part of Dr. Foster is that he failed to timely diagnose and treat Mrs. Suire's condition. We first note that the expert testimony supports Dr. Foster's decision not to start Mrs. Suire on prophylactic antibiotic therapy prior to surgery because of her Penicillin allergy. Concerning Dr. Foster's failure to diagnose the infection, the record indicates Dr. Foster was notified of Mrs. Suire's changing condition at 5:40 p.m. on April 12. Although he was not able to personally examine her at this time because of another emergency, he did gather the pertinent information and approximately two hours later called in a specialist. Because Dr. Foster was otherwise occupied, and because Dr. Rotenberg was better qualified to treat the problems Mrs. Suire exhibited at that time, Dr. Foster deferred to Dr. Rotenberg's judgment for the next several hours. Given these facts and the expert testimony supporting Dr. Foster's actions, we do not believe the trial court erred in finding no negligence on the part of Dr. Foster in diagnosing Mrs. Suire's rare condition.
The remaining allegations of malpractice pertain not to Dr. Foster, but to Dr. Rotenberg, a consulting physician independent of Dr. Foster, and for whose acts Dr. Foster cannot be held responsible. For instance, Dr. Rotenberg determined that several diagnostic tests had to be conducted before Mrs. Suire could be given antibiotics. Dr. Rotenberg made the decision to treat Mrs. Suire initially with Tobramycin, a drug known to combat primarily gram negative organisms. Dr. Rotenberg based this decision on two factors: 1. The most likely source of the patient's infection was the urinary tract because she had been catheterized postsurgery, and urinary tract infections are generally from gram negative organisms. 2. The patient was allergic to Penicillin and therefore had an increased *623 chance of an allergic reaction to those antibiotics which are effective against gram positive organisms. Finally, Dr. Rotenberg made the decision not to order a gram stain of the surgical incision because there was no evidence of an incisional or wound infection; he felt that such a procedure could introduce infection into an otherwise clean wound. None of these decisions constitute acts of negligence or malpractice on the part of Dr. Foster.
We will not address plaintiffs' remaining allegations of trial court error because they do not pertain to Dr. Foster. The trial court found no negligence on the part of Dr. Foster and the record supports that finding.
For the foregoing reasons, the judgment of the trial court in favor of Dr. William F. Foster and Lake Charles Memorial Hospital in dismissing plaintiffs' suit is affirmed. Costs of this appeal are assessed to plaintiffs, Preston Joseph Suire, Clayton Jude Suire, Rachel Suire LaSalle, Ranger Insurance Company, and Heritage Manor Nursing Home.
AFFIRMED.