636 So.2d 1042 (1994)
Lorena ARD, et al.
v.
EAST JEFFERSON GENERAL HOSPITAL.
No. 93-CA-969.
Court of Appeal of Louisiana, Fifth Circuit.
April 14, 1994.
*1043 James E. Hritz, Metairie, for defendant/appellee.
Darleen M. Jacobs, New Orleans, for plaintiffs/appellants.
Before KLIEBERT, GRISBAUM, and WICKER, JJ.
WICKER, Judge.
This appeal arises from a wrongful death and survival action filed on behalf of Lorena Ard and Sheila Ard[1], plaintiffs/appellants, and against East Jefferson General Hospital, defendant/cross-appellant, alleging negligence for the death of Devon Ard. The trial judge granted judgment in favor of the plaintiff, Lorena Ard in the amount of $50,000.00 in general damages and $6,290.55 in special damages. He awarded Sheila Bond $10,000.00 in general damages. All parties have appealed.
On May 3, 1984 Devon Ard was admitted to East Jefferson. His admitting diagnosis was a past history of myocardial infarction, stroke and unstable angina. He was 64 years old at the time. Devon Ard subsequently underwent a five-vessel coronary bypass surgery on May 8, 1984. He remained in intensive care until May 13, 1984 due to respiratory problems. On May 15, 1984 he had respiratory failure and was transferred to the critical care unit. A bronchoscopy was performed to determine the cause of the respiratory problems. He was transferred from the critical care unit on May 20, 1984. Lorena Ard, Devon Ard's wife, testified the nursing staff did not respond timely to her calls for assistance from 5:30 p.m. to 6:45 p.m. At approximately 6:45 p.m. he stopped breathing and a code was called. He never regained consciousness and died two days later, May 22, 1984, from respiratory failure and cardiac arrest.
*1044 On appeal East Jefferson asserts manifest error and the failure to establish causation.

CREDIBILITY:
East Jefferson contends that Lorena Ard's testimony is so contradicted by all other testimony as well as the contemporaneous documentation that her credibility was destroyed.
The Louisiana Supreme Court has held in Rosell v. Esco, 549 So.2d 840, 844-45 (La. 1989):
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a fact finder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. [citations omitted].
East Jefferson argues Lorena Ard's testimony that she called for assistance and no one came is contradicted by objective documentation and all other testimony. We find no manifest error in the trial judge's making a credibility determination and evidently concluding Lorena Ard tried and did not get assistance for one hour and fifteen minutes while her husband was in distress. Our review of the record indicates the following:
Lorena Ard, who at the time of trial was 70 years old, testified as follows. She stated that on the afternoon of May 20, 1984 she was with her husband. He began feeling nauseous and experiencing shortness of breath. She rang the bell several times and got no response. Finally someone did respond sometime in the evening and brought him a tablet. His nausea worsened. He also vomited once or twice and was in "terrible pain." She described him as "reeling from one side of the bed to the other." She was trying to hold him so he would not fall off the bed.
She testified she continued to ring for a nurse when she noticed he was having difficulty breathing. She called ten or twelve times and was told a nurse was not there. She estimated she rang the bell for an hour and fifteen minutes to an hour and a half. She told the nurse as she rang he was nauseous and vomiting and she could not hold him down. She also noted he was pale. The last time she called she noticed his eyes were rolled back. She reported he was dying and needed a nurse. Someone finally did respond and called a code.
Appellant correctly notes some minor inconsistencies in Lorena Ard's testimony with the medical record. Both the medical record and the testimony by Dr. Brach, a pulmonologist, indicate respiratory therapy was successfully given to Devon Ard at 4:30 p.m. on May 20, 1984 although disputed by Lorena Ard. Both the medical record and the testimony of the attending nurse, Sally Florscheim, indicate a suppository was given to Devon Ard by virtue of a telephone order from Dr. Preis, a treating cardiologist, at 5:30 p.m. on May 20, 1984 although disputed by Lorena Ard.
However, the medical records do provide contemporaneous documentation that on May 20, 1984 between the time of 5:30 p.m. and 6:45 p.m., approximately one hour and fifteen minutes, there is no notation any nurse or doctor checked on him. Therefore, Lorena Ard's testimony regarding this time period is consistent with the medical records.

LIABILITY:
East Jefferson Hospital was sued on the basis of the negligence of its nurses. Registered or licensed practical nurses as well as the hospital are health care providers. La.R.S. 40:1299.41(A)(1).
The Louisiana Supreme Court held in Smith v. State Through Dept. DHHR, 523 So.2d 815 (La.1988) at 819:

*1045 In a medical malpractice action against a hospital, the plaintiff must prove, as in any negligence action, that the defendant owed the plaintiff a duty to protect against the risk involved, that the defendant breached that duty, and that the plaintiff suffered an injury, and that the defendant's actions were a substantial cause in fact of the injury.
There is ample evidence in the record to support the trial judge's evidently concluding the nursing staff at East Jefferson breached the standard of nursing care in the community.
Celia Krebs, an expert in general nursing, testified she reviewed the medical records and various documents. She determined there were six breaches of the standard of care. She particularly stated that after May 15, 1984 it was obvious to the nurses from the doctors' progress notes that Devon Ard had a floppy epiglottis and trouble swallowing. Mentioned in the progress notes were references to his past stroke and pseudobulbar palsy which was related to the stroke; the possibility of decreased respiratory drive; limited neck movement; recent problems with extubation, and difficulty with glottic function. These indicate he was a high risk for aspiration. This problem was never addressed in the nurse's care plan or in the nurses' notes. It would be something which would be absolutely addressed. She also indicated the progress notes by the doctor on the 17th indicated a secretion problem. At this point, she stated, the problem became an actual one instead of a potential one.
On May 20, 1984 Devon Ard's assigned nurse was Sally Florscheim. Krebs stated Florscheim did not do a full assessment of his respiratory and lung status. There is nothing in the record indicating Florscheim did such an evaluation after he vomited. Furthermore, Krebs testified no total swallowing assessment was made at any time by a nurse.
Although Florscheim testified she checked on Devon Ard around 6:00 p.m. on the 20th there is no documentation in the medical record. Krebs stated the rule in registered nursing is to write down such information. She testified it is also important to write down a response to medication. She stated there was no documentation that anyone checked on him between 5:30 p.m. and 6:45 p.m. on the 20th. He should have been checked more often because he was a high risk for aspiration and had vomited at 5:30 p.m. The nurses' failure to check him in that period was below the standard of care in the community.
Krebs was asked the significance of the lack of nursing care during that hour and fifteen minute period. She replied that he could easily have aspirated at 5:30 p.m. When asked her opinion as to when he aspirated she stated that should be deferred to a pulmonologist.
Florscheim testified she first began caring for Ard on May 3, 1984. After surgery he was placed in the coronary care unit. She saw him either at 3:00 p.m. or 3:30 p.m. on May 20th after he was transferred back from the coronary care unit. He arrived on her unit that day at 1:20 or 1:30 p.m. She stated she checked his vital signs at 4:00 p.m. She documented this. She noted in her notes that he had crackles in the base of the lungs and was breathing a bit rapidly. At 5:30 p.m. she noted the complaint of nausea and had vomited. At that time he was restless and "couldn't find a place for himself in the bed." She gave him a suppository after contacting Dr. Pries. At 5:30 p.m. she did not take his vital signs. She did not know whether anyone else took them.
She denied that the next time she saw him was 6:45 p.m. She stated she saw him around 6:00 p.m. She stated he was resting more comfortably and still had a little nausea. She did not take his vital signs at that time. She did not know if anyone else did. Afterwards she went downstairs to eat dinner. She next saw him at 6:45 p.m. When she got off the elevator she saw Ms. Ard waving her arms screaming for help. She asked for help in getting her husband up in the bed. No other nurses were present and Florscheim went to help. She saw that Ard had vomited and was heaving. He was having problems catching his breath. His respiration was rapid and there was gurgling. He was a little blue around the lips which suggested *1046 he was not getting enough air. She lifted him so that he could catch his breath and ran to the door yelling for the suction and Dr. Preis. When she went back to the room Ard was slumped over and not breathing. She called the code and did mouth to mouth resuscitation. He never regained consciousness. He was taken to the coronary care unit and died May 22, 1984.
She stated a nurse was assigned to his care when she left for dinner but she did not know whether this nurse visited his room after she left. She admitted the medical records did not reflect whether any nurse looked in on him when she went to dinner. She did not recall whether she had asked any of the other nurses whether Ms. Ard had asked for help. She admitted that she did not believe there were any nurses at the desk when she came back after dinner but stated they were "[p]resumably ... taking care of their patients." She did not know this personally because she did not see them.
She admitted she had no way of knowing whether Ms. Ard pressed the emergency call button. She stated that according to the medical records no nursing care was provided to him during the period from 5:30 p.m. to 6:45 p.m.
Sharon Devon testified she was the charge nurse on May 20, 1984. She stated she (Devon) was working that evening. She did not remember what happened to him between 5:30 p.m. and 6:45 p.m. She admitted if a patient was in the type of distress testified to by Lorena Ard it would be below the standard of nursing care to fail to provide him with medical attention during this hour and fifteen minute period. However, she stated the failure to respond was not the practice in her unit.
She thought she had gone to dinner with Florscheim that day. That would have left two registered nurses and one LPN to care for 32 patients.
Juanita Farris, an expert in intensive care nursing and a registered nurse, testified for the defense. She reviewed the records. She disagreed with Krebs that there was a breach of the standard of care.
On cross-examination she admitted that if a patient were in the type of distress described by Lorena Ard and no nurse checked on him for an hour and fifteen minutes that would fall below the standard of care.
Dr. Lahman Preis, a cardiologist; Dr. Bruce Iteld, a cardiologist, and Dr. Bernard Brach, a pulmonary expert, all testified that if Devon Ard was in the type of distress described by his wife someone should have responded.
We conclude that there is ample evidence to support the trial judge's conclusion the nursing staff breached the standard of care. We next determine whether there is manifest error with regard to causation since La.R.S. 9:2794(A)(3) requires the plaintiff to prove that as a "proximate result" of the defendant's failure to use the required degree of care, "the plaintiff suffered injuries that would not otherwise have been incurred." Smith, supra at 820.
The Smith court held that proof requires that "the defendant's actions were a substantial cause in fact of the injury." Id. at 819. However, the court adopted the "loss of chance" doctrine in death cases. Id. at 821. The Smith court explained at 820:
In a situation where the patient dies, we have held that the plaintiff does not have to shoulder the "unreasonable burden" of proving that the patient would have lived had proper treatment been given. Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 721 (La.1986). Instead, the plaintiff must prove "only that there would have been a chance of survival," and that the patient was denied this chance of survival because of the defendant's negligence. Id. at 720.
See also Martin v. East Jefferson General Hosp., 582 So.2d 1272, 1277-78 (La.1991).
Dr. Bruce Iteld, a member of the medical review panel and an expert in the fields of medicine and cardiology, testified that with Devon Ard's history and with reports of nausea, vomiting, rolling around in bed, paleness, and blueness he would have wanted to be notified by the attending nurse had he been the treating physician.
He would have transferred him back to intensive care immediately. He would have *1047 done this because it looked like he was going to have a respiratory and cardiac arrest. Possibly, had he been transferred to the cardiac unit his chances of going into a code would have been averted. When asked whether this would be more probable than not he replied:
This is a very sick gentleman and already had two respiratory problems ... I think he would have had a much better chance of survival in the intensive care unit. [Emphasis added].
We find no manifest error in the trial judge's evidently relying on the testimony of Dr. Iteld regarding Devon Ard's "loss of chance" of survival. That testimony is supported by the testimony of his treating physician, Dr. Lahmen Preis, a cardiologist.
Dr. Preis testified that had Devon Ard been in the type of distress described by his wife he would have wanted to be notified. He would have come to see him, performed tests and moved him to the critical care unit to be watched.
Appellant correctly notes the record is devoid of evidence the negligence of the nursing staff caused Devon Ard's death by aspiration. At 6:45 p.m. Devon Ard suffered a respiratory arrest and subsequently died. Krebs testimony suggests Devon Ard could have aspirated at 5:30 p.m. She explained aspiration could cause him to remain for the hour and fifteen minute period with vomitus in his lungs increasing his carbon dioxide levels. However, she deferred the cause for his being coded at 6:45 p.m. to a physician.
Dr. Iteld stated that if Devon Ard aspirated at 5:30 p.m. he would have been in respiratory distress at that time. Dr. Preis testified Devon Ard would not have survived due to his severe lack of respiratory reserve had he aspirated at 5:30 p.m. He stated respiratory arrest occurred within a brief moment of time. Dr. Bernard Brach, an expert in pulmonology, testified the more likely explanation for the respiratory arrest at 6:45 p.m. was his prior stroke's affecting his breathing.
Furthermore, Dr. Iteld testified that people aspirate during the resuscitation procedure. He did not view aspiration as the cause of the respiratory and cardiac arrest which caused his death.
Nevertheless, there is evidence the negligence of the nurses lessened Devon Ard's chance of survival by his not being transferred to the intensive care unit prior to his being coded. We follow Smith and its adoption of the "loss of chance" doctrine.

QUANTUM:
Cross-appellants specify as error the following:
The trial court abused its discretion by awarding inadequate amounts for general damages to Lorena Ard and Sheila Ard.
In particular they argue the trial judge abused his discretion in only awarding a surviving spouse $50,000.00 and the surviving major child $10,000.00.
In determining whether there has been an abuse of the discretion of the trial judge we are guided by the explanation given by the Louisiana Supreme Court in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993):
the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award.
Lorena Ard testified she and her husband had been married but once, to each other for 40 years. They were very close and did "everything together." She now lives alone and misses him. She was with him during his hospital stay.
Sheila Bond testified she was close to her father. She stayed with her mother at the hospital for almost the entire time he had been there.
She testified she was an only child and was "spoiled". She considered herself, "daddy's girl". He motivated, inspired, and encouraged her. He encouraged her to pursue a nursing career. After his stroke she shared hobbies with him, such as catfish ponds. She and her husband traveled with her parents. *1048 Her parents lived directly across from her. Her father watched her children so she could work. She stated she missed him "greatly" and was in shock when his condition worsened.
Under these circumstances we find an abuse of discretion. We follow the guideline enunciated in Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976) and raise Lorena Ard's general damage award from $50,000.00 to $150,000.00 and Sheila Bond's general damage award from $10,000.00 to $50,000.00.
Recent general damage awards for adult children range from $50,000.00 to $100,000.00 and for a surviving spouse range from $150,000.00 to $325,000.00. See Bourgeois v. Puerto Rican Marine Manage., 589 So.2d 1226, 1241-42 (La.App. 4th Cir.1991), writ denied, 592 So.2d 1299, 1300 (La.1992).
Accordingly, for the reasons stated the judgment in favor of Lorena Ard and against East Jefferson General Hospital, Inc. is amended and she is hereby awarded general damages of $150,000.00. The judgment in favor of Sheila Bond and against East Jefferson General Hospital, Inc. is amended and she is hereby awarded general damages of $50,000.00. The judgment is otherwise affirmed.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] Sheila Ard was identified at trial as "Sheila Bonds" and in the judgment as "Sheila Bond" although she was referred to as "Sheila Ard" in the petition.