I .YELVERTON, J.
Willie Jones checked himself into River-North Treatment Center in Alexandria for detoxification from alcohol and prescrip *555 tion drugs. He entered the hospital- oh August 8, 1992. On the morning of August 13, he was found dead in his bed. His son, Chris Jones, filed a medical malpractice suit for damages against Willie’s treating physician, Dr. David Shepard. Damages were stipulated to be no more than $50,000, so the case was tried by a judge instead of a jury. The trial judge found that Dr. Shepard was negligent for failing to monitor Willie properly and awarded damages in the amount of $50,000. Dr. Shepherd appeals.
This was not the'first time that Willie was hospitalized for detoxification. He was admitted on several occasions in other facilities in 1987, 1988, and 1991. It appears that his addiction to pain medication began when he had back surgery about 17 years earlier. Not long before his admission at RiverNorth, his wife died after suffering from cancer. Some of the medications he was abusing, including Dilaudid, were drugs that had been prescribed for his wife. The other drugs he admitted taking were Vicodin, Darvocet, Doral, Zantac, and Prozac. Willie was also suffering from an alcohol problem since age 13. He was drinking a fifth of alcohol a day at the time of this admission.
Pat Parquette, the registered nurse on duty, admitted him to RiverNorth. She called Dr. Shepherd, who initially started Willie on a one-milligram Catapres patch for the opiate problem and 100 milligrams of Librium for the alcohol problem. Later that evening, Dr. Shepherd came by the hospital and met with Willie. Dr. Shepherd testified that he also talked to some of the people who worked with Willie on admission at another facility, and that they told him they had had a difficult time with lathe patient. Dr. Shepard testified that based on Willie’s previous problems with detoxification and his abuse of opiates, he decided to start him on Methadone.
It was the Methadone that plaintiff claimed caused Willie’s demise. His son contended that had Willie not been given Methadone he would still be alive today. The trial court found that Dr. Shepherd did ■ not prescribe Methadone improperly under the circumstances, but that:
[T]he right to prescribe dangerous medications carries with it the responsibility to monitor the patient in such a way that avoidable incidences such as this do not occur. This responsibility cannot be contracted away.
Had the defendant doctor in the instant case properly monitored the patient he could have easily, according to his own testimony, saved the life of Willie Jones.
Dr. Shepard’s appeal argues that it was the nursing staffs responsibility to monitor the patient. Dr. Shepard claims that the trial court erred in imposing upon him the obligation of monitoring his hospitalized patient on a twenty-four hour basis when that obligation, both by protocol of RiverNorth and the jurisprudence, was imposed upon the nursing staff.
Louisiana Revised Statute 9:2794 sets forth the burden of proof required in a medical malpractice action as follows:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., ... the plaintiff shall have the burden of proving:
■ (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical speciality.
1«(2) That the defendant either lacked this degree of knowledge or skill or *556 failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
[[Image here]]
C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician, dentist, optometrist, or chiropractic physician....
Willie was found dead in his bed at 6:00 a.m. on August 13. He had been checked on during the night with no apparent problems. Although the autopsy suggests that Willie died from cardiac arrhythmia, Dr. Stephen Norman, the pathologist who performed the autopsy, testified that he reached this conclusion because of the lack of other findings and that he had not seen the post-mortem toxicology reports. Testimony from the many experts who testified in this case revealed that Methadone alone or combined with other drugs may increase the risk for respiratory depression. Respiratory depression can in turn result in a cardiac arrhythmia because oxygen fails to get to the heart. It appears that this is what caused Willie’s death.
There appears to be no disagreement in the record with the fact that had Methadone not been used, Willie would still be alive. Both sides presented conflicting evidence concerning the use of Methadone to treat Willie. The trial court found that the expert testimony supported Dr. Shepard’s reasons for wanting to use Methadone to treat Willie, i.e., previous failed attempts at detoxification and opiate drug dependence. This finding of fact is not disputed, and we see no need to discuss the issues raised in the tidal court concerning the use of Methadone in Willie’s case. RHowever, the trial court found that the use of this dangerous medication carried with it a responsibility to carefully monitor Willie. The trial court found that Dr. Shepard was negligent in failing to monitor Willie properly while using. Methadone and that this failure resulted in Willie’s death.
Dr. Shepard argues that it was the nursing staffs responsibility to monitor Willie and to notify him of any changes in Willie’s condition, citing Donaldson v. Sanders, 94-1366 (La.App. 3 Cir. 7/19/95); 661 So.2d 1010; Suire v. Lake Charles Memorial Hosp., 590 So.2d 619 (La.App. 3 Cir.1991); and Ard v. East Jefferson General Hosp., 93-969 (La.App. 5 Cir. 4/14/94); 636 So.2d 1042. . While we agree that, generally, nurses are required to notify doctors of significant changes or any changes the doctor has requested he be notified about, we also recognize that a case-by-case analysis must be made as to this issue because the standards may vary. This duty is usually established by the testimony of experts in the case. La.R.S. 9:2794.
Nurse Parquette testified that if a problem occurred, the nurses were supposed to call Dr. Shepard. Nurse Par-quette verified that the written treatment plan for Willie called for the nurses to monitor and record vital signs and report abnormalities and complaints of physical symptoms to Dr. Shepard.
This is the first time that Methadone had been used for treatment at River-North. Dr. Shepard himself had only administered Methadone once, which was ten years earlier in 1982 at another facility. A great deal of evidence was introduced concerning the use of Methadone in the drug detoxification arena and the need to be watchful of its effects on the patient and his condition.
Dr. John Thompson, who had specialized training and experience in treating patients that abuse alcohol and drugs, testified on behalf of plaintiff. He explained that there was documented evidence in both the recreational therapy notes and | Bnursing notes before his death that Willie *557 was getting progressively more ataxic and obtunded and unable to appreciate his surroundings.
Nurse Parquette testified that there were 32 items which appeared in the chart from Willie’s admission until his death which indicated he was sedated. Some of these items included fuzziness and grogginess, walking with a loose gait, inability to start psychiatric testing due to drowsiness and lethargy, trying to eat something through its Saran wrapper, and not remembering eating dinner.
Dr. Thompson testified that most of these signs are early indications that the person is becoming sedated or overly sedated which should have raised the doctor’s suspicions. These signs were indications that Willie’s brain was becoming more and more sedated which affected his coordination. Eventually, he slipped into a coma, and finally, he stopped breathing.
Dr. Thompson opined that Dr. Shepard was more focused on relieving Willie’s signs of withdrawal than he was on over sedating him. He stated that in any detox protocol, it is the risk/benefits analysis that you have to constantly make. It was Dr. Thompson’s observation that the chart indicated other people were recognizing that Willie was “zoned out,” but Dr. Shepard did not. Dr. Thompson stated that had Dr. Shepard recognized that Willie was obtunded, then he could have given him some Narcan and totally reversed the effects of Methadone right there before his eyes.
Willie’s daughter, son, and sister all testified about Willie’s condition when they went to visit him on the night before he died. They explained how he was very sleepy and confused. His speech was slurred, and his movements were uncoordinated. Willie was “out of it.” Specifically, the family explained how he could not lift a cup to his mouth to drink, and he could not light a cigarette. Willie’s sister testified that she called every day and could tell that Willie was getting worse.
IfrDr. Clyde Elliott, a family practitioner, sat on the medical review panel which unanimously found in favor of Dr. Shepard. Although Dr. Elliott was of the opinion that Dr. Shepherd exhibited the knowledge and skill and exercised the degree of care ordinarily exercised by physicians that practice alcohol and drug detox, he testified generally about the use of drugs in detoxing patients. When testifying about the reason doctors use certain drugs, Dr. Elliott stated that each doctor is familiar and comfortable with whatever drugs of detox they use. He further explained that once a doctor becomes familiar and comfortable with the drugs of choice and the crew working with him, who also in turn become familiar with the drugs, then the doctor usually follows that pattern. He explained that it is a learned experience and becomes the one the doctor is comfortable with so he can control it better. Dr. Elliott also stated that any drug should be used with caution and certain things should be monitored when using drugs. He explained that the patient is monitored through behavior, blood pressure, pulse, respiration, and his actions.
Dr. Carlton Erickson, an expert in the field of pharmacology who testified for Dr. Shepard, also explained that clinical signs and symptoms are important in following the course of treatment and seeing how the patient is doing as he is being treated. He testified that it did appear that Willie was getting more and more sedated as the days went on.
Dr. Shepard admitted that he was concerned that Willie would walk out of the hospital because he had done it before but that his intention was to control the symp-tomology of the withdrawals. Dr. Shepard testified that he did not think that using Methadone was risky because Willie was in a controlled environment where vital signs were taken frequently.
|7Pr. Shepard agreed that most of the signs of sedation listed by Nurse Par-quette indicated a pattern of gradual sedation but stated that most of these signs *558 began after he saw Willie on the morning before he died. Dr. Shepard saw Willie the morning before he died, and he looked fine. Dr. Simoneaux, a psychologist, saw Willie at 11:00 a.m. and noted that his verbal and motor abilities were slow. Dr. Shepard called at 4:00 p.m. the day before he died and testified that he was told everything was fine. He did not go to the hospital to check on him that afternoon or night.
Dr. Shepard testified that Willie was a very neat and well-groomed person. He stated that had anyone called him and told him that Willie’s hair was not combed and that he had tried eating through Saran paper, he would have sent Willie to the emergency room immediately and given him Narcan to reverse the effects of the Methadone. Dr. Shepard testified that he was never notified of any problems.
There is an entry in the nurses’ notes by a Nurse Ruckles which indicates it was belatedly entered on August 13, 1992, at 12:80 p.m., but it was for August 12 at 11:00 p.m. This note seems to contradict what Dr. Shepard said he was told when he called at 4:00 p.m. It states that the nurse reported to Dr. Shepard the information that had been passed on at shift change, which included the vital signs, fever, and some patient confusion; and that the occupational therapist reported that the patient had difficulty doing a ceramics project because he was not understanding the directions and worked on the back side. It also states that it was reported to Dr. Shepard that Willie was drooling and observed trying to eat something through its Saran wrapper. The entry then states that Dr. Shepard asked the staff to keep Willie in bed most of the time through the evening and next day because of the fever and a sore throat.
| sThis entry was made after Willie died. Nurse Parquette explained that a late entry in the nurses’ notes is an acceptable practice when you have a jot book in which you keep the information to be recorded at a later time.
Based on these nurses’ notes, as recorded by Nurse Ruckles, Dr. Shepard was informed of some of the more serious signs exhibited by Willie that day when he called in at 4:00. Dr. Shepard denied this. Nurse Ruckles did not testify at trial. Even if we believed Dr. Shepard, there is still sufficient evidence in the record that Willie was exhibiting signs of sedation before his last night which should have put Dr. Shepard on notice that Willie was getting more sedated. Dr. Shepard even agreed that Willie was more sedate on the last two days of admission but stated that was his goal. ‘
There is also some evidence in the record through one of the two post-mortem toxicology screens that perhaps Willie took some Dalmane while in RiverNorth which had not been prescribed and did not come from the hospital pharmacy. If this happened, it could have increased the tendency of the Methadone to cause respiratory depression. Dr. Erickson testified that it is a common practice in inpatient hospital settings for patients to get stashes of drugs brought to them or left on the grounds at a predetermined place.
Dr. Shephard was aware that Willie may have possibly been “cheeking” his Methadone pills to increase the effect he felt from the medication by taking more at one time. The nursing records reveal that a Methadone pill had been found by housekeeping on August 10 in the hall. A check of the pharmacy records revealed that Willie probably did not take a dose he had been given to take. Dr. Shepard told the nurses to watch Willie for “cheeking.” Since Dr. Shepard had extensive experience in dealing with detoxification patients and was aware that Willie might 13be trying to “cheek” his medication, Dr. Shepard should have been aware that Willie might also try to obtain other drugs increasing the potential for respiratory depression problems.
It is clear in this case that Willie died because he was taking Methadone. *559 Whether the combination of Methadone and Dalmane caused the problem or just the Methadone alone is uncertain. Regardless, there was evidence in the record that Willie was showing signs of over sedation even before his final day in River-North. Even Dr. Shepard agreed that it was his responsibility to know the condition of his patients and that the effects of Methadone could be reversed in a matter of minutes with Narcan. This is especially true in this case since Methadone had never been administered at RiverNorth before, so the staff had no experience in handling Methadone. Dr. Shepard was the only one who had used Methadone, and his experience was limited to just one occasion. Under these circumstances, the testimony at trial indicates that Dr. Shepard had a duty to monitor Willie. The trial judge made a finding of fact that included credibility determinations. Applying well-settled principles of appellate review, we find neither legal nor manifest error in the trial judge’s conclusion that Dr. Shepard failed in his duty to properly monitor Willie.
The judgment was for $50,000. Chris Jones brought the suit in two capacities, individually and as administrator of his father’s estate. The judgment made no allocation of the damages. This is a potential problem which needs correction, and on our own motion we will correct it. La. Code Civ.P. art. 2164. Our careful examination of the record reveals that there is no testimony or other evidence to support wrongful death damages. There is evidence to support damages suffered by the victim. We will allocate the entirety of the award to the survival action, and the judgment is amended accordingly.
hoThe judgment of the trial court is affirmed as amended. Costs of this appeal are assessed to Dr. David Shepard.
AFFIRMED AS AMENDED.