832 So.2d 1089 (2002)
Charles Ray TAYLOR, Jr., et ux.
v.
Dr. Richard J. CLEMENT and the Louisiana Patient's Compensation Fund.
No. 02-561.
Court of Appeal of Louisiana, Third Circuit.
December 4, 2002.
*1090 Oliver "Jackson" Schrumpf, Law Offices of Oliver "Jackson" Schrumpf and Charles Schrumpf (APLC), Sulphur, LA, for Plaintiffs/Appellees, Charles Ray Taylor, Jr., et ux.
Dr. Richard J. Clement (Proper Person), M. Keith Prudhomme, Woodley, Williams, Boudreau, Norman, Brown & Doyle, L.L.C., Lake Charles, LA, for Defendant/Appellant, Louisiana Patient's Compensation Fund.
Court composed of ULYSSES GENE THIBODEAUX, OSWALD A. DECUIR and JIMMIE C. PETERS, Judges.
THIBODEAUX, Judge.
In this medical malpractice case, the Patient's Compensation Fund (PCF) appeals a judgment of the trial court in favor of the plaintiffs, Sharon and Charles Ray Taylor, Jr., whose infant son died twenty-four days after his birth. The trial court concluded that venue for plaintiffs' suit filed against the PCF is proper in Calcasieu Parish; that a summary judgment was properly granted in favor of the Taylors on the issue of whether Dr. Richard J. Clement was a Qualified Health Care Provider (QHCP), and that Dr. Clement's treatment of Sharon and her infant son, Charles Ray Taylor III (Charles III) was the cause of the injuries to and subsequent death of the infant. Lastly, the trial court concluded that the Taylors were entitled to $500,000.00,[1] an amount the PCF asserts is excessive.
For the following reasons we affirm the judgment of the trial court.

I.

ISSUES
The first issue in this case involves the trial court's ruling that venue was proper in Calcasieu Parish. The PCF asserts that the Taylors' Petition for Declaratory Judgment concerning Dr. Clement's status as a QHCP filed in connection with their medical malpractice claim should have been filed in a separate proceeding in East Baton Rouge Parish, the PCF's principal place of business, in accordance with La. *1091 Code Civ.P. art. 42 and La.R.S. 40:694(B). Whether Dr. Clement was a QHCP, the PCF contends, is a decision of the PCF Board located in East Baton Rouge Parish. The second issue is whether the trial court erred in granting summary judgment on the Taylors' petition for declaratory judgment with respect to whether Dr. Clement was a QHCP because "there exist[ed] several issues of material fact precluding summary judgment." Third, the PCF asserts that the trial court erred in finding that Dr. Clement was liable for the plaintiffs' injuries or, alternatively, the trial court's damage award in the amount of $500,000.00 is excessive.

II.

FACTS
Prior to the birth of her son, Charles III, Sharon had been under the care of Dr. Richard Barry for prenatal services. On October 29, 1994, Sharon arrived at Lake Charles Memorial Hospital (LCMH) in labor. Because Dr. Barry was unable to be at the hospital, Dr. Clement was called to the hospital to attend Sharon. When Dr. Clement arrived, he saw that the feet and ankles of the unborn child were protruding from Sharon's vagina. Although a heart monitor was not in place upon Dr. Clement's arrival, a heart rate of between 110 and 138 was recorded after a nurse attending Sharon placed a fetal heart monitor on the child. Dr. Clement testified that an unborn baby with such a fetal heart rate is doing well.
Dr. Clement conducted a vaginal delivery of the baby at 1:53 a.m. on October 29, 1994. At one minute old, the baby had an APGAR, a score assigned to a newborn infant indicating the infant's well being, of two and was not breathing. Efforts to resuscitate Charles III began. At five minutes old, the baby's APGAR score increased to five, another low score. The attending nurse, Janean Henning, testified that the two low scores indicated that the baby needed continued resuscitation. By ten minutes old, the baby's APGAR reached a level of nine, an acceptable score. On November 22, 1994, twenty-four days after his birth, Charles III died.

Procedural Background
The Taylors filed a petition for damages on October 30, 1995.[2] They also served the PCF with a copy of the damage petition. The Taylors' petition was dismissed upon the granting of the defendants' Exception of Prematurity based on the fact that Dr. Clement was a self-insured qualified health care provider and the matter had not been first submitted to the medical review panel as required by the Louisiana Medical Malpractice Act (LaMMPA). Thus, the matter proceeded to the medical review panel which rendered an opinion on November 16, 1998, against Dr. Clement. Following the panel's ruling, on January 13, 1999, the Taylors again filed their petition in district court. After a two day bench trial, the Taylors were awarded $500,000.00, plus interest and costs from the date the claim was filed with the PCF. The judgment was signed on June 22, 2001. On July 3, 2001, the Taylors' counsel was notified by the PCF that their malpractice claim was no longer qualified for coverage by the PCF because Dr. Clement was no longer a QHCP.
The Taylors then filed a "Supplemental Petition for Declaratory Judgment" on July 30, 2001, seeking, among other things, a determination as to Dr. Clement's status as a QHCP pursuant to La.R.S. 40:1299.41, et seq. It was not until the Taylors filed this pleading that the PCF became aware of the June 22, 2001 judgment. When it received notice of the June, 2001 judgment *1092 in the declaratory judgment petition, the PCF filed a petition for suspensive appeal, and order for which was signed on August 23, 2001. The PCF wanted to preserve its right to appeal the June 22, 2001 judgment in the event the court would find that Dr. Clement was a QHCP with respect to the Taylors' claims.
On August 23, 2001, the PCF filed exceptions of venue, prematurity, improper cumulation/joinder and also requested a trial by jury. On August 28, 2001, the Taylors filed a motion for summary judgment with respect to their supplemental petition seeking a declaratory judgment and also filed a motion to strike the PCF's request for a jury trial.
A hearing on all of these matters was held on October 12, 2001. Ultimately the trial court granted the PCF's exception of prematurity but denied its exception of venue. A judgment reflecting that decision was signed on December 11, 2001. With respect to the Taylors' motion for summary judgment, the trial court issued written reasons for judgment on February 6, 2002, granting the Taylors' motion on the issue of Dr. Clement's status as QHCP. A judgment conforming to these written reasons was signed on February 27, 2002 and designated as a final judgment of the court. It is from that judgment that the PCF filed the present appeal. The Taylors have answered the PCF's appeal requesting damages for frivolous appeal, principally on the issue of whether Dr. Clement was a QHCP.

III.

LAW AND DISCUSSION

Venue
The PCF asserts that the Taylors' petition for declaratory judgment filed as a supplemental action to their medical malpractice claim should have been brought in East Baton Rouge Parish as a separate proceeding against the PCF. Essentially, the PCF argues that Dr. Clement's status as a QHCP is unrelated to the commission of malpractice in Calcasieu Parish and is a decision made by the board whose principal place of business is East Baton Rouge Parish. The PCF further argues that the venue provisions of the Administrative Procedure Act support its position that the Taylors should have filed their suit in East Baton Rouge Parish.
In Underwood v. Lane Memorial Hosp., 97-1997, p. 3 (La.7/8/98); 714 So.2d 715, 716-17 the supreme court discussed the meaning of venue pursuant to Louisiana law:
Venue means the parish where an action may properly be brought and tried under the rules regulating the subject. La.Code Civ. Proc. Art. 41. Venue provisions are significantly different from jurisdictional provisions. Code articles governing jurisdiction over the person, for instance, are based largely on constitutional requirements of due process and of full faith and credit. On the other hand, Code articles governing venue are based on legislative considerations for allocating cases, according to the particular action and the particular parties, among the various parishes which have an interest in the action (over which some Louisiana court has the constitutional power to exercise jurisdiction).
The original concept of venue was that "one must be sued before his own judge." Former La.Code Practice art. 162. This concept, however, has become anachronistic with the ever-increasing number of legislative exceptions to venue at the party's domicile.
The 1960 Code of Civil Procedure divided the rules of venue into three categories: (1) Article 44 provides a non-waivable mandatory venue for actions *1093 such as nullity of judgment; (2) Articles 78 through 83 provide a preferred but waivable venue which governs exclusively when the rule conflicts with any article except Article 44; and (3) Article 42 provides a general venue in which the defendant must be sued at his "home base," but is subject to numerous exceptions in Articles 71 through 77, which provide specific optional venues that the plaintiff may choose as an alternative to the venue in Article 42. Thus, the rules of venue today are less designed to provide protection for the defendant, who has no constitutional right to be tried in a particular forum, and more designed to allocate cases among parishes with an interest in the proceedings so as to provide for efficient disposition of caseloads.
(Case citations omitted).
The PCF is a legislatively-created fund administered by the Louisiana Patients' Compensation Fund Oversight Board. The purpose of the PCF is to hold private monies in trust to protect victims of medical malpractice and its QHCP members who may be found liable for damages caused by their malpractice. La.R.S. 40:1299.44(A)(1). As the PCF correctly asserts, its principal place of business is located in East Baton Rouge Parish. Relying on the general rules of venue, the PCF asserts that the proper venue for the Taylors' petition for declaratory judgment is East Baton Rouge Parish. Louisiana Code of Civil Procedure Article 42 provides generally that a defendant must be sued in the parish of his domicile. However, La.Code Civ.P. arts. 71 through 77 provide exceptions to that general rule. Specifically, La.Code Civ.P. art. 74 provides in pertinent part:
An action for the recovery of damages for an offense or quasi offense may be brought in the parish where the wrongful conduct occurred, or in the parish where the damages were sustained.
Furthermore, La.Code Civ.P. art. 73 provides in pertinent part:
A. An action against joint or solidary obligors may be brought in a parish of proper venue, under Article 42 only, as to any obligor who is made a defendant provided that an action for the recovery of damages for an offense or quasi offense against joint or solidary obligors may be brought in the parish where the plaintiff is domiciled if the parish of plaintiff's domicile would be a parish of proper venue against any defendant under either Article 76 or R.S. 13:3203.
The Taylors brought a medical malpractice action against Dr. Clement for his actions that occurred in Calcasieu Parish. The PCF, as the entity created, in part, to protect QHCPs from financial ruin due to medical malpractice claims, was added as a party to the lawsuit and is an obligor, albeit contractually, with Dr. Clement. Thus, in accordance with the venue provisions cited above, Calcasieu Parish is the proper venue for a determination of Dr. Clement's QHCP status.
Lending further support to the finding of proper venue in Calcasieu Parish is La.R.S. 13:5104(A) that provides:
A. All suits filed against the state of Louisiana or any state agency may be instituted before the district court of the judicial district in which the state capitol is located or in the district court having jurisdiction in the parish in which the cause of action arises.
See also Williams v. State, 35,928 (La.App. 2 Cir. 4/3/02); 813 So.2d 1206, writ denied, 02-1279 (La.8/30/02); 823 So.2d 955, where the court held that "may" [in La.R.S. 13:5104(A)] is permissive; thus, a state agency may also be subject to suit in a parish of proper venue as to a defendant who is a solidary obligor with the agency. Dr. Clement's actions occurred in Calcasieu Parish. The PCF mistakenly relies *1094 upon the venue provisions governing judicial review of the PCF's decisions found in the Administrative Procedure Act, especially La.R.S. 49:964(A) and (B), that provide for a review of a final decision of a state agency order in the district court of the parish in which the agency is located. However, La.R.S. 49:964(A) and (B) presupposes that there was some type of contradictory hearing or proceeding at the state agency level and a final order or decision was made. In the present case, there was no contradictory proceeding wherein the PCF entered an order concluding that Dr. Clement was not a QHCP. Further, the permissive "may" is in this provision as well; therefore, a plaintiff is not required to seek review in the parish where the agency is located. Thus, the venue provisions of the administrative procedure statutes are inapplicable.

Summary Judgment
The PCF asserts that a factual dispute exists as to Dr. Clement's status as QHCP. Neither party disputes that on the date of the alleged malpractice, October 29, 1994, Dr. Clement was considered a qualified self-insured healthcare provider with an occurrence type policy. There is also no question that Dr. Clement was qualified at the time the Taylors made their claim against Dr. Clement for medical malpractice. However, the PCF argues that because the security posted to the PCF by Dr. Clements was seized sometime after October 29, 1994, to satisfy another judgment against him, and because Dr. Clement failed to replace the security seized, he is no longer qualified for coverage by the PCF. Thus, they are not liable for the Taylors' judgment in excess of $100,000.00. On July 3, 2001, well past the date of the alleged malpractice, the filing of the Taylors' claim against Dr. Clement, and judgment in favor of the Taylors on their medical malpractice claim, the PCF notified counsel for the Taylors that Dr. Clement was no longer a QHCP.
In Sewell v. Doctors Hospital, 600 So.2d 577, 578 (La. 1992) the supreme court stated that:
The principal purpose of the Medical Malpractice Act is to limit the liability of health care providers who qualify under the Act by maintaining specified basic malpractice insurance and by contributing a surcharge to the Patients Compensation Fund. As long as a health care provider remains qualified under the Act, the health care provider and his insurer are liable for malpractice only to the extent provided in the Act. La.Rev. Stat. 40:1299.45 A.
The Medical Malpractice Act's limitations on the liability of a health care provider are special legislation in derogation of the rights of tort victims. As such, the coverage of the Act should be strictly construed. These limitations apply only in cases of liability for malpractice as defined in the Act. Any other liability of the health care provider to the patient is not subject to these limitations.
Id.
Louisiana Revised Statutes 40:1299.42(E)(1) provides:
Financial responsibility of a health care provider under this Section may be established only by filing with the board proof that the health care provider is insured by a policy of malpractice liability insurance in the amount of at least one hundred thousand dollars per claim with qualification under this Section taking effect and following the same form as the policy of malpractice liability insurance of the health care provider, or in the event the health care provider is self-insured, proof of financial responsibility by depositing with the board one hundred twenty-five thousand dollars in *1095 money or represented by irrevocable letters of credit, federally insured certificates of deposit, bonds, securities, cash values of insurance, or any other security approved by the board. In the event any portion of said amount is seized pursuant to the judicial process, the self-insured health care provider shall have five days to deposit with the board the amounts so seized. The health care provider's failure to timely post said amounts with the board shall terminate his enrollment in the Patient's Compensation Fund.
(Emphasis added).
Pursuant to the seizure of Dr. Clement's security, the PCF attempted to have Dr. Clement post additional security in place of the security seized within five days in accordance with La.R.S. 40:1299.42(E)(1). Dr. Clement failed or refused to replace the security. The trial court found that Dr. Clement's failure to provide a deposit after the original deposit amount was seized should only terminate his enrollment with the PCF for claims initiated after the date Dr. Clement was notified that his enrollment was terminated. Ultimately, the trial court found that there was no genuine issue of material fact precluding summary judgment. We agree.
Dr. Clement was an enrolled QHCP on the date of the occurrence of the medical practice, on the date the Taylors filed their claim against Dr. Clement, and on the date the judgment against Dr. Clement was signed. The Act does not expressly state that a healthcare provider, qualified at the time of the medical negligence, qualified at the time of a complaint of medical negligence is filed, and qualified at the time judgment against the healthcare provider is signed, is somehow disqualified when it comes time to pay on the judgment because sometime after these events, the healthcare provider is terminated. Further, the July 3, 2001 letter sent by the PCF to counsel for the Taylors stated that Dr. Clement was "no longer a qualified provider." We construe the phrase, "no longer" to mean after the date of the letter and henceforth.
Support for our interpretation of the PCF's termination notice can be found in a recent fifth circuit case, Perdue v. Sudderth, 02-357 (La.App. 5 Cir. 10/29/02); 831 So.2d 1050, cited by the Taylors in their supplemental brief, where similar to the present case a physician allowed his self-insurance deposit with the PCF to lapse. In Perdue, the physician's certificate of self-insurance deposit was still held by the PCF at the time the plaintiff filed her claim against Dr. Sudderth. However, Dr. Sudderth had other claims pending against him and one claimant obtained a judgment in her favor in the amount of $375,000.00 therefore, the certificate of deposit held by the PCF on behalf of Dr. Sudderth was used to satisfy that judgment. Dr. Sudderth, after receiving notice from the PCF to restore his deposit, failed to do so and his status as a QHCP was terminated as of August 6, 1996. Like Dr. Sudderth, Dr. Clement in the present case failed to restore his deposit after notification of its seizure by another claimant. The PCF asserted, as it does in the present case, that because Dr. Sudderth's qualification was terminated, it was no longer responsible for payment on her claim. The fifth circuit noted, as have we, that the Act is silent as to what happens to pending claims, or for that matter, claims that have reached final judgment, when a self-insured doctor's qualification is terminated. Ultimately, the fifth circuit concluded that "the failure to replenish the deposit should terminate enrollment of the provider, but only as to claims filed after the date of disqualification." Id. at p. 5, 831 So.2d at 1052. Like the plaintiff in Perdue, the PCF notified the Taylors that Dr. Clement was a QHCP and they proceeded with *1096 their claim pursuant to the Act's requirements. Therefore, as the fifth circuit found in Perdue, the Taylors' "rights under the Act should not be terminated, and the PCF should not be able to deny coverage, because the doctor subsequently [and in the present case, after the Taylors' claim was reduced to a judgment in their favor] became disqualified due to his own failure to replenish his deposit." Id. Thus, we find that for purposes of the Taylors' case, Dr. Clement is a QHCP and summary judgment in favor of the Taylors on this issue was proper.

Dr. Clement's Liability
The issue of Dr. Clement's liability for the suffering and the death of the Taylors' child is subject to the manifest error/clearly wrong standard of review as set out in Stobart v. State Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993), Rosell v. ESCO, 549 So.2d 840 (La.1989) and Clement v. Frey, 95-1119 (La.1/16/96); 666 So.2d 607.
Pursuant to La.R.S. 9:2794.1, in order to prevail in a medical malpractice case the plaintiff must prove:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
The standard of care that a physician is to render to a patient is set forth in Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654, 661 (La. 1989):
In a medical malpractice action against a physician, the plaintiff must establish the doctor's deviation from the standard of care exercised by others in the same field. The plaintiff must also show a causal relationship between the doctor's alleged negligence and the resulting injury. La.R.S. 9:2794(A); Smith v. State, 523 So.2d 815 (La.1988).
The evidence in this case shows that Dr. Clement arrived to deliver the Taylors' baby. Upon his arrival, the fetus was in a double footling breech position. In a double footling breech position, the baby's feet are at the vaginal opening and the baby's head is at the top of the uterus. A baby in a normal position at the time of delivery has its head at the vaginal opening and feet at the top of the uterus. Dr. Clement testified that the feet were protruding outside of Sharon's body upon his arrival. Nurse Henning testified that a baby in the position of the Taylor baby is usually delivered by c-section and that she never saw a vaginal delivery of a double footling breech baby. Moreover, the medical review panel members all agreed and testified at trial that footling breech deliveries are not done vaginally because of the danger of the umbilical cord coming out with the baby's body and being squeezed so as to cut off the baby's oxygen supply. Also, a c-section delivery is recommended because a newborn baby's head is quite large in comparison *1097 to the baby's body thus, there is the danger of delivering the trunk and extremities, but causing the baby's head to get trapped in the cervix. With the mother's contractions, cord and neck compression may occur causing a lack of oxygen to the baby's brain. A compression of the cord for five minutes could cause brain damage.
Instead of proceeding to conduct a c-section delivery of the Taylor infant, Dr. Clement chose to do a complicated vaginal delivery. The testimony at trial further revealed that a c-section delivery could have been accomplished in a short amount of time using general anesthesia. Dr. John Colligan, an obstetrician/gynecologist who served on the medical review panel investigating Dr. Clement's actions and who testified at trial, stated that by using "general anesthesia with the crash induction technique," Sharon would have been asleep within one to two minutes. Because of the difficulty in getting the baby out of the vaginal canal, Dr. Clement ordered the attending nurses to push on Sharon's stomach to facilitate the baby's delivery. Dr. Colligan further stated that Dr. Clement's order to the nurses to apply fundal pressure was inappropriate because when the nurses pushed on Sharon's stomach, they were actually pushing on the baby's head which could cause head trauma to a baby in a double footling breech position.
Dr. Clement was the only witness to testify that he was not liable for the suffering and death of the Taylors' baby. Dr. Clement's primary contention is that the baby was dead before he was delivered. However, the medical records and the testimony of Nurse Henning reveal that there were two instances when the baby's heart rate was recorded at 110 and later at 138, both indications that the umbilical cord was not prolapsed and within the normal range of a baby who is doing well. The medical review panel and the trial court found that Dr. Clement was negligent in his delivery of the Taylor baby. We agree and find no merit to the PCF's argument that Dr. Clement was not liable.

Damages
The PCF contends that the amount of damages awarded to the Taylors is excessive. The standard for an appellate court's review of damages was well established in Reck v. Stevens, 373 So.2d 498 (La.1979) and was confirmed in Youn v. Maritime Overseas, Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Suffice it to say, we will not disturb a trial court's award of damages unless we find that the award constitutes an abuse of the trial court's discretion. In its written reasons for judgment, the trial court stated the following with respect to damages:
When considering damages, the elements to be considered are the medical expenses of plaintiffs which are not disputed to be $23,209.98, funeral expenses of $587.68, burial expense $400.00, Perkin's Pharmacy $175.23. Insofar as the damages of CHARLES RAY TAYLOR, III for pain, suffering and disability as a result of the twenty-four (24) days of life in acute distress, the Court feels an appropriate award would be $100,000.00 which is inherited by his parents. For the past, present, future pain and suffering of SHARON TAYLOR and CHARLES RAY TAYLOR, JR. who have suffered much anguish not only during the twenty-four (24) days of the life of their child visiting him frequently in the hospital and subsequent problems in their relationship and marriage which occurred as a result of the grief, the Court feels each parent is entitled to an award of $250,000.00.
The award will be reduced in accordance with the "cap limitations" on medical *1098 malpractice cases a total of $500,000.00 plus interest and costs from the date the claim was filed with the Louisiana Compensation Fund, together with expert witness fees to be fixed upon presentation of the appropriate motion to the Court.
(Emphasis in original).
After a thorough review of the entire record, we find that the trial court did not abuse its great discretion in the assessment of damages.

Frivolous Appeal
The Taylors answered the PCF's appeal seeking attorney fees and the payment of costs for defense of a frivolous appeal pursuant to La.Code Civ.P. art. 2164. The courts have been very reluctant to grant damages under this article, as it is penal in nature and must be strictly construed. Guarantee Sys. Const. & Restoration, Inc. v. Anthony, 97-1877 (La. App. 1 Cir. 9/25/98); 728 So.2d 398, writ denied, 98-2701 (La.12/18/98); 734 So.2d 636. In order to assess damages for a frivolous appeal, it must appear that the appeal was taken solely for the purpose of delay or that counsel does not sincerely believe in the view of law he advocates. Id., 728 So.2d at 405. However, an appeal is not automatically deemed frivolous simply because it lacks merit. Broussard v. Union Pacific Res. Co., 00-1079 (La.App. 3 Cir. 1/31/01); 778 So.2d 1199, writ denied, 01-0589 (La.4/27/01); 791 So.2d 118, citing Hershell Corp. v. Fireman's Fund Ins. Co., 98-1352 (La.App. 3 Cir. 6/2/99); 743 So.2d 698, writ denied, 99-1923 (La.9/17/99); 747 So.2d 568. While the issue of Dr. Clement's status as an enrolled QHCP advanced by the PCF as an issue for review may be substantively tenuous, there is no evidence that the appeal was taken for delay or that counsel was insincere. To the contrary, as evidenced by the foregoing, this case contains novel legal questions concerning the status of self-insured healthcare providers who, for whatever reason, do not replenish their deposits with the PCF upon demand after the deposit is seized pursuant to La.R.S. 40:1299.42(E)(1), and whose enrollment is terminated after judgment in favor of plaintiffs is obtained.

IV.

CONCLUSION
For these reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to defendants-appellants, Dr. Richard Clement and the Louisiana Patient's Compensation Fund.
AFFIRMED.
NOTES
[1] The total amount awarded was $624,372.89 but this amount was reduced pursuant to damage limitation provided in La.R.S. 40:1299.42(B)(1).
[2] October 29, 1995 was a Sunday.